**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Deborah Caldwell,<br><br>          Plaintiff,<br><br>     vs.<br><br>J & J Rocket Company dba JP Consultants,<br><br>          Defendant. | No. CV-13-08043-PCT-PGR<br><br>ORDER |

Pending before the Court is Plaintiff's Motion for Summary Judgment on Count Two (Doc. 36), which is the plaintiff's Breach of Contract claim in her First Amended Complaint. Having considered the parties' memoranda and the evidence of record submitted by the parties, the Court finds that there are no genuine issues of material fact and that plaintiff Deborah Caldwell's summary judgment motion should be granted as a matter of law pursuant to Fed.R.Civ.P. 56.[1]

---

[1]
    Although both parties have requested oral argument, the Court concludes that none is necessary because the parties have had an adequate opportunity to provide the Court with evidence and legal memoranda supporting their respective positions and oral argument would not significantly aid the decisional process. *See* Partridge v. Reich, 141 F.3d 920, 926 (9th Cir.1998).
    The Court notes that there is apparently an issue between the parties as to whether any part of Count One remains to be resolved.

Background[2]

Defendant J & J Rocket Company dba JP Consultants ("JP Consultants") is a consulting company that provides training, teaching and coaching on various leadership topics; its principal is Jo Ann Panke. JP Consultants had a contract with the Center for Drug Evaluation and Research ("CDER"), a subunit of the United States Food and Drug Administration ("FDA"), to provide a leadership course curriculum called Preceptor for a Change ("PAC"). The PAC curriculum was taught to separate consecutive small groups of students referred to as Cohorts. In October 2010, JP Consultants, through Panke, entered into a Professional Services Agreement ("PSA") with plaintiff Deborah Caldwell, an experienced professional instructor and coach, whereby she was to work as an independent contractor for a one-year period providing instruction services to JP Consultants' clients; the PSA provided that it was to be construed and interpreted under Arizona law. The primary work done by Caldwell was teaching and coaching the PAC course at CDER. The PSA recognized that Caldwell's work with the PAC program would bring her into contact with JP Consultants' clients, clients' employees and management.

---

[2] The facts relevant to the breach of contract claim referred to in this section are those that the Court deems to be undisputed based on the parties' statements of facts.

The Court notes that in reviewing Defendant's Controverting Statement of Facts in Opposition to Plaintiff's Motion for Summary Judgment on Count Two ("CSOF") (Doc. 40), it discovered that JP Consultants at some point, apparently around its responses to Caldwell's Statement of Facts ("SOF") 35-37 (Doc.37) inadvertently left out a response to one of Caldwell's statement of facts, thus leading it to misnumber its remaining controverting responses (numbers 37-63), e.g. JP Consultants' CSOF 37, which is supposed to be a response to Caldwell's SOF 37, is actually JP Consultants' response to the Caldwell's SOF 38. The Court has taken JP Consultants' numbering mistakes into account in determining which of Caldwell's statements of fact JP Consultants does not controvert.

After the PSA ended by its own terms in October 2011, Caldwell continued teaching the PAC cohorts at CDER for JP Consultants despite the lack of any written contract. On August 27, 2012, Panke emailed Caldwell a new draft agreement for her signature because Panke desired Caldwell to continue her relationship with JP Consultants. On September 5, 2012, Caldwell sent Panke an email rejecting the draft agreement and proposing a revised agreement. On September 7, 2012, Panke notified Caldwell through an email that she was rejecting Caldwell's counteroffer and that JP Consultants was terminating its relationship with her in October 2012. That same day, Panke sent an email to Janice Newcomb, the director of CDER's Office of Executive Programs Division of Training and Development, informing her that Caldwell was leaving JP Consultants in order to pursue her own independent contacts; at that time, Panke intended that Caldwell's last day at CDER would be October 26, 2012, and she then believed that it was permissible for Caldwell to seek independent consulting contracts outside of CDER and JP Consultants' current client pool.

On September 9, 2012, Panke sent Caldwell a formal notice of termination. The termination letter gave Caldwell eight weeks notice of termination because Panke did not believe she then had cause to terminate Caldwell notwithstanding her suspicions that Caldwell, without Panke's knowledge or permission, had been improperly communicating for several weeks directly with both Janice Newcomb and Virginia Giroux, CDER's deputy director for training, that Caldwell was improperly withholding information from Panke, and that she had been communicating about competing with JP Consultants. Panke's suspicions regarding Caldwell's communications were based solely on her perception of the breakdown in communications between her and Newcomb and how Newcomb and Giroux were

treating her at that point and not on anything anybody had told her about any improper communications on Caldwell's part with Newcomb and Giroux.

Although she no longer had a written contract with JP Consultants, Caldwell began teaching and coaching PAC Cohort 9 at CDER for JP Consultants in September 2012. Despite her continuing suspicions about disloyalty on Caldwell's part, Panke approached Caldwell on October 10, 2012 about the possibility of Caldwell continuing to work for JP Consultants through the completion of PAC Cohort 9, and on October 18, 2012, Panke sent Caldwell a draft contract. Caldwell made a final counteroffer to JP Consultants on October 22, 2012. On October 23, 2012, Panke sent Caldwell an email stating that she would agree to have Caldwell finishing teaching and coaching PAC Cohort 9 with the specific compensation terms that Caldwell had proposed the day before[3]; Panke added a term to the effect that Caldwell was to act with a high degree of professionalism.[4] Later that same day, Caldwell emailed Panke that "[w]e are in agreement that I will finish PAC C9 which ends in June 2013." Both parties believe that the October 23rd emails constituted a binding agreement.

On January 8, 2013, Caldwell and Panke had a meeting regarding the status

---

[3] Panke's email stated in relevant part that "[i]n the best interests of the PAC program, I will agree to have you finish teaching and coaching PAC C9. In exchange for your work, I will compensate you at $1,500/day, $125/day per diem and $500/month airfare."

[4] What Panke stated in her email regarding professionalism was:

As you continue to be a representative of JP Consultants while working at CDER I trust you will conduct yourself in the same professional manner as you have shown in the past. I also trust that you will continue to deliver the PAC C9 program with the same high level of instruction.

of the PAC Cohort 9 that Caldwell was still teaching for JP Consultants; during that meeting, Caldwell informed Panke that she was looking into working with several FDA sub-organizations other than CDER. On January 13, 2013, Panke sent Caldwell a letter claiming that she was prohibited from competing with JP Consultants until at least November 2014. Panke included the November 2014 date because it was three years after the expiration of the October 2010 PSA which contained a three-year non-compete provision. Panke informed Newcomb and Giroux at CDER that Caldwell could not perform any program instruction for FDA-related agencies on her own until October 2014.

Caldwell filed this action on March 4, 2013. The single claim in the original complaint sought to have the three-year non-compete provision in the expired PSA declared unenforceable.[5] When Panke learned the next day that Caldwell had sued JP Consultants, she decided to terminate Caldwell. Early on March 9, 2013, Panke telephoned Giroux to inform her that Caldwell's relationship with JP Consultants was being terminated as a result of her lawsuit. Later that same day, Panke emailed a termination notice to Caldwell; the notice informed Caldwell that her services were no longer needed by JP Consultants "effective immediately" and that the non-compete provision of the October 2010 PSA survived her termination and would be enforced. On April 4, 2013, Caldwell filed an amended complaint in this action adding a breach of contract claim based on JP Consultants' early termination of the parties' October 23, 2012 email agreement. JP Consultants, while raising affirmative defenses, has not filed a counterclaim against Caldwell for breach of contract or for

---

[5] In an order entered on July 2, 2013, the Court granted Caldwell's Motion for Partial Judgment to the extent that the Court declared that the three-year non-compete covenant in the parties' October 12, 2010 PSA was unenforceable under Arizona law.

breach of the implied covenant of good faith and fair dealing.

Discussion

      Caldwell has moved for summary judgment on her breach of contract claim. In order to prove her claim, she has the burden of establishing the existence of a contract, its breach, and resulting damage. Graham v. Asbury, 540 P.2d 656, 657 (Ariz.1975). The Court concludes that Caldwell has met her initial burden of proof in that JP Consultants does not dispute that the parties entered into a binding email contract in October 2012, that its termination of Caldwell in March 2013 was prior to the June 2013 expiration of the parties' email agreement, and while JP Consultants disputes that it owes Caldwell any damages, it does not controvert Caldwell's contention that she lost the amount of $31,100 as a result of JP Consultants' early termination of the parties' contract.

      Since Caldwell has furnished undisputed proof of the parties' contract and the fact of her dismissal, the burden is on JP Consultants to prove its affirmative defense that it terminated Caldwell's services for cause because she breached the parties' October 2012 email agreement. *See* Palicka v. Ruth Fisher School District No. 90 of Maricopa County, 473 P.2d 807, 811 (Ariz.App.1970) (In an action by a teacher suing the school board for breach of contract, the court, relying on "the general rule that the party asserting the affirmative of an issue has the burden of proving it[,]" stated that "after the teacher had established her teaching contract and the fact of dismissal, both of which the Board admitted, the burden of establishing good cause as a defense rested with the Board.") JP Consultants' specific allegation as to this affirmative defense, as set forth in its First Amended Answer to First Amended Complaint (Doc. 29), and reiterated in its CSOF 83 and in its response to Caldwell's summary judgment motion, is that Caldwell "violated her express and implied

1  obligations under the Agreement, including her duty of good faith and fair dealing, by acting disloyally and insubordinate as a result of her efforts to repudiate her contractual obligations to Defendant, and her efforts to compete against and take clients - namely CDER and IHS - of JP Consulting [sic]."

The issue before the Court is whether JP Consultants has submitted evidence of sufficient quantum and quality to create a genuine issue of material fact as to whether Caldwell's conduct after the formation of the October 2012 email agreement justified her termination because it amounted to a material breach of certain expressed and implied duties owed to JP Consultants pursuant to the parties' email agreement and the covenant of good faith and fair dealing implied in that agreement. Zancanaro v. Cross, 339 P.2d 746, 750 (Ariz.1959) ("Ordinarily the victim of a minor or partial breach must continue his own performance, while collecting damages for whatever loss the minor breach has caused him; the victim of a material or total breach is excused form further performance."); Murphy Farrell Development, LLLP v. Sourant, 272 P.3d 355, 364 (Ariz.App.2012) ("[A]n uncured material breach of contract relieves the non-breaching party from the duty to perform and can discharge that party from the contract.")  Under Arizona law, a material breach of a contract occurs when (1) a party fails to perform a substantial part of the contract or one or more of its essential terms or conditions, or (2) when it fails to do something required by the contract which is so important to the contract that the breach defeats the very purpose of the contract. Dialog4 System Engineering GmbH v. Circuit Research Labs, Inc., 622 F.Supp.2d 814, 822 (D.Ariz.2009).  Similarly, under Arizona law, a party breaches the covenant of good faith and fair dealing by denying the other party the reasonably expected benefits of the contract. FL Receivables Trust 2002-A v. Arizona Mills L.L.C., 281 P.3d 1028, 1037 (Ariz.App.2012). Caldwell argues, and the

Court agrees, that JP Consultants has not met its burden of showing that Caldwell breached her express or implied duties arising from the October 2012 contract in any material manner.[6]

The parties agree that Caldwell's relationship to JP Consultants was one of agency as an independent contractor, and as such she owed JP Consultants a fiduciary duty, which included a duty of loyalty. *See* McCallister Co. v. Kastella, 825 P.2d 980, 982 (Ariz.1992) ("[I]n Arizona, an employee/agent owes his or her employer/principal a fiduciary duty.")

A. Duty Not to Compete With JP Consultants

JP Consultants argues that Caldwell's conduct violated her duty of loyalty in several aspects as a result of her endeavors to remain in the same teaching and coaching business after the end of PAC Cohort 9, *i.e.,* that she violated her duty not to compete with JP Consultants while working for it, that she violated her duty to keep JP Consultants informed of its business opportunities, and that she violated her duty to act for JP Consultants' benefit and not her own.

Given her duty of loyalty, Caldwell was precluded from actively competing with JP Consultants concerning the subject matter of her agency while working for it. *Id.* She was, however, clearly permitted by Arizona law to take action during the period of her agency to prepare for competing with JP Consultants after the termination of her agency relationship with it, so long as that preparation did not take the form of acts directly competing with JP Consultants. *Id.*, at 982-83; Taser International, Inc. v. Ward, 231 P.3d 921, 926 (Ariz.App. 2010).

---

[6] None of JP Consultants' arguments concerning Caldwell's conduct are directed at the manner in which she taught and coached the PAC course at CDER and there is no evidence that she did not do so competently in compliance with her contract with JP Consultants.

- 8 -

In its basically conclusory arguments that Caldwell improperly solicited for work in competition with it prior to being terminated, JP Consultants relies on its CSOF 78, which, referencing Caldwell's deposition, states *in toto*: "Caldwell emailed or called at least four individuals at either CDER or NIH to 'gauge interest' in having Caldwell perform instruction services apart from JP Consultants. [Ex. 17 at 76, lns. 7-23; 78, lns. 8-14; 79[,] lns. 8-24; 81 ln. 4 to 82. ln. 18]."[7] JP Consultants does not, however, set forth in its statements of facts or in its response who these individuals were or what Caldwell communicated to them. That information, however, is crucial because the determination of the line separating mere preparation from active competition depends on the nature of the preparations to compete. Taser International, 231 P.3d at 926.

According to the specific deposition citations noted, but not set forth, by JP Consultants, it is relying on the following testimony by Caldwell to support its defense that she was properly terminated due to her pre-termination attempts to compete with it: (1) that prior to her termination, Caldwell emailed Mr. Pucino, who used to work at the National Institutes of Health, to find out if he knew someone at

---

[7] The Court notes that in determining whether JP Consultants has submitted evidence of a sufficient caliber and quantity to support a verdict in its favor on its affirmative defense, the Court has relied on those portions of the submitted evidence specifically cited to by the parties in their statements of facts. *See* Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir.1996) (noting that it is not the district court's task to "scour the record in search of a genuine issue of triable fact" since it is the obligation of the nonmoving party "to identify with reasonable particularity the evidence that precludes summary judgment.")

Because neither party has objected to their introduction, the Court also notes that it has considered the portions of Panke's and Caldwell's depositions specifically cited to by the parties notwithstanding that neither party has properly authenticated those depositions. *See* Orr v. Bank of America, NT & SA, 285 F.3d 764, 773-74 (9th Cir.2002).

NIH that Caldwell "might contact there to gauge interest" because she "was getting information so that [she] could prepare to see if there was an opening where [she] might make a marketing call, but [she] had not made one[;]" (2) that Caldwell emailed Marjorie Shapiro, a former student who was a leader in a PAC cohort prior to Cohort 9, to make a request similar to the one that she made to Pucino; (3) that at some point in March 2013, Caldwell telephoned Donna Lipscomb, one of the names given to her by Shapiro, and left a message but never spoke to her, and that the purpose of her call was "[t]o inquire if they currently ran a leadership program or team program[;]" and (4) that at that point in time she made phone calls or sent emails to other people "along the same lines" as she described for Lipscomb.

The Court is not persuaded that JP Consultants has met its burden of showing that there is a disputed issue of material fact as to this aspect of its affirmative defense inasmuch as it fails to discuss in its response, and thus fails to provide any cogent argument supported by legal authority, how any of this limited evidence amounts to something other than legally permissible preparations to compete by Caldwell, *i.e.*, how this evidence sufficiently establishes that Caldwell was soliciting work as opposed to seeking information about future work. JP Consultants does not cite to any evidence that Caldwell, prior to her termination, directly solicited as a future client any entity that JP Consultants currently had a contract with or any entity that it had an interest in obtaining as a client, or that she even learned of any business opportunity that she might obtain to compete with JP Consultants. For example, while JP Consultants has cited to Caldwell's testimony that she sought to obtain some contact information at NIH prior to her termination, there is no evidence of record that NIH was a client of JP Consultants or that it was interested in obtaining

NIH as a client.[8]

JP Consultants also relies on its uncontroverted CSOF 79, wherein it cites to Caldwell's testimony that she did not believe that she had a contractual or legal obligation to refrain from competing with JP Consultants during the time she was teaching Cohort 9. The Court is also not persuaded that Caldwell's cited testimony amounts to significant probative evidence that she materially breached the October 2012 email agreement because her testimony was based on her understanding as a layperson that the agreement did not contain a provision banning competition and, more importantly, because JP Consultants does not provide any cogent argument as to why Caldwell's claimed ability to compete with it amounts to evidence that she actually competed with it or even attempted to compete with it in a way that materially breached the parties' agreement.

B. Duty of Professionalism

JP Consultants also contends in its response that Caldwell breached her duty of loyalty and her contractual duty of professionalism by disclosing too much information to CDER-related personnel, *i.e.,* "she exceeded her contractual terms by disclosing more information to CDER than agreed, and by disclosing her termination to those who had no reason to be in the loop."[9]

---

[8] The Court notes that NIH is not mentioned in JP Consultants' affirmative defense, which states that Caldwell violated her duty not to compete by her efforts to take CDER and IHS [Indian Health Service] as her own clients.

[9] JP Consultants' reliance on its uncontroverted CSOF 90, which cites to Caldwell's testimony that she did not have a contractual duty of loyalty under her understanding of the email agreement, does not amount to significant probative evidence that she committed any disloyal acts while she was teaching Cohort 9, much less that she materially breached her duty of loyalty.

Underlying JP Consultants' contention is its unsupported belief that Caldwell contractually agreed to limit her communication to JP Consultants' clients according to her proposal in her October 22, 2012-email counteroffer to Jo Ann Panke. *See* CSOF 70 ("In addition to agreeing to perform under the highest professional standards, Caldwell further agreed to limit her communications to JP Consultants' clients according to the terms of the agreement she proposed. [Ex. 17 at 54, lns. 1-4].") JP Consultants' contention is based ¶ 4 in Caldwell's counteroffer, wherein she proposed:

> 4. I will tell Janice [Newcomb] (and anyone else whom I need to inform) that we were not able to work out an agreement on other work, so I will no longer be working under JP Consultants' contract other than to complete teaching and coaching Cohort 9, and JP Consultants will be making other arrangements for any other projects, and that she should discuss that with you.

This proposed term, however, did not become part of the parties' email agreement because Panke did not include that part of Caldwell's proposal in her October 23, 2012 responsive email wherein she, on behalf of JP Consultants, agreed to Caldwell's financial terms for completing Cohort 9. Panke's deposition testimony makes it clear that she intentionally did not accept all of the terms proposed in Caldwell's October 22nd counteroffer and what terms she did not accept she left out of her October 23rd acceptance email (Panke's depo., Pltf's Ex.2, at 57 ln. 24 to 58 ln. 19), and Panke specifically stated in this regard that she "did not agree to [Caldwell's] number 4." (Panke's depo. at 59, lns. 21-22). For this reason, JP Consultants' arguments that Caldwell's communications to Janice Newcomb and other CDER employees, such as Brenda Pillari (CSOF 77, noting Caldwell's deposition testimony that Pillari as not a CDER employee who needed to known about Caldwell's job status) "far exceeded her contractual authority" are unsupported to the extent they are based on Caldwell's proposed ¶ 4 being a term of the parties'

contract.

JP Consultants also argues that Caldwell, through her communications with Janice Newcomb concerning her contractual dispute with JP Consultants, violated her duty of professionalism because she failed to maintain JP Consultants' friendly relationship with CDER. While there is evidence from Jo Ann Panke that her relationship with Newcomb deteriorated prior to Caldwell's termination, JP Consultants does not cite to, or even discuss, any non-speculative evidence in the record that Caldwell's conduct was responsible for any rift between JP Consultants and CDER. The evidence of record specifically cited to by Caldwell, and admitted by JP Consultants, is that Panke merely suspected that her deteriorating relationship with Newcomb was due to Caldwell's communications with Newcomb and Virginia Giroux at CDER, and that no one connected to CDER informed her that Caldwell had made any negative comments about JP Consultants or that any of Caldwell's communications with them adversely affected CDER's relationship with JP Consultants. *See* Caldwell's uncontroverted SOF 60-62.[10]

But in any case, even if Caldwell's comments to CDER employees about the status of her relationship with JP Consultants and her desires to continue teaching and coaching courses similar to the PAC course amounted to disloyal or

---

[10]
For example, Caldwell's SOF 62, which JP Consultants specifically admitted in its misnumbered CSOF 61, states:

Neither Ms. Giroux, Ms. Newcomb nor anyone else from CDER ever told Ms. Panke that Ms. Caldwell said anything negative about JP Consultants or that Ms. Caldwell made any proposal or suggestion that she replace JP Consultants as a consultant to CDER. [Panke Dep., Exh. 2, at 80:1-9.] Ms. Panke never even asked Ms. Newcomb or Ms. Giroux whether Ms. Caldwell had engaged in any such communication. [Panke Dep., Exh. 2, at 48:3-13,]

- 13 -

unprofessional acts contrary to her duty of loyalty to JP Consultants, JP Consultants has failed to discuss, and certainly has not established, how these acts amounted to a material breach of Caldwell's express or implied duties arising from the October 2012 agreement.

While normally the issue of whether a fiduciary duty of loyalty has been breached is a question of fact to be determined by the trier of fact, <u>McCallister Co. v. Kastella</u>, 825 P.2d at 984, JP Consultants, as the party with the burden of proof on this issue, has the obligation to submit more than a "scintilla of evidence" in support of its affirmative defense because evidence that is "merely colorable" or "not significantly probative," as is the case here, is not sufficient to present a genuine issue of material fact for the trier of fact to resolve. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 254 (1986); <u>Nelson v. Pima Community College</u>, 83 F.3d 1075, 1081-82 (9th Cir.1975) ("The mere existence of a scintilla of evidence is not enough to create a genuine issue of material fact in order to preclude summary judgment. Likewise, mere allegation and speculation do not create a factual dispute for purposes of summary judgment.") (internal quotation marks and citations omitted). The Court, without weighing the evidence and without making any credibility determinations, concludes as a matter of law that the evidence specifically relied on by JP Consultants and the justifiable inferences arising from that evidence, all viewed in JP Consultants' favor, is simply insufficient to create a triable issue as to whether Caldwell, prior to her termination, materially breached any express or implied duty owed to JP Consultants. *See* <u>McCallister Co.</u>, at 985 (Court granted summary judgment to employee sued for breach of the duty of loyalty because the evidence presented by the employer failed to raise a factual issue that the employee, while still employed, had attempted to solicit the employer's clients or employees so

that she could start a rival business.)  Therefore,

IT IS ORDERED that Plaintiff's Motion for Summary Judgment on Count Two (Doc. 36) is granted.

IT IS FURTHER ORDERED that the parties, after reasonable consultation, shall no later than October 31, 2014, file either a joint report setting forth what remains to be decided in this action and a proposed schedule for resolving the remainder of the action, or a stipulation dismissing any remaining claims or issues and a proposed form of judgment.

DATED this 30th day of September, 2014.

Paul G. Rosenblatt
United States District Judge